**E-FILED**
Friday, 12 January, 2007  11:38:05 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SARAH GARDNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 04-3112 |
| | ) | |
| STATE OF ILLINOIS, DEPARTMENT | ) | |
| OF CHILDREN AND FAMILY | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

This case is before the Court on the Defendant's motion for summary judgment.

## I. BACKGROUND

Plaintiff Sarah Gardner alleges that her employer, the Illinois Department of Children and Family Services ("the Defendant" or "DCFS"), retaliated against her for exercising her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).  The Defendant contends it is

1

entitled to summary judgment because the Plaintiff is unable to make out a prima facie case of retaliation. The Defendant further claims that even if the Plaintiff could allege a prima facie case, she is unable to produce evidence which shows that its legitimate reasons for the employment decision are pretextual.

A. Defendant's undisputed material facts

(1)

DCFS is an agency in Illinois engaged in providing child welfare services. The senior executive for DCFS is the Director. In 2003, there were a number of divisions within DCFS, with the chief of each division reporting to the Director. In some instances, these positions were titled "Chief," and in others they were titled "Deputy Director." The Defendant alleges that the divisions included, among others, External Affairs, Personnel and Affirmative Action. The Plaintiff disputes the contention that the affirmative action position was a "division." She claims that Director Bryan Samuels testified "that the affirmative action position did not in and of itself have a division."

2

The Defendant alleges that the Plaintiff has been employed at DCFS since 1989 as an assistant affirmative action officer.  The Plaintiff notes that from January 1, 2003 through December 31, 2003, she worked as the acting chief of affirmative action.  In April 2000, the Plaintiff filed a lawsuit against DCFS challenging her classification and compensation, and the claim was settled.  The Defendant alleges that Director Samuels knew nothing about the 2000 lawsuit until after this current lawsuit was filed. The Plaintiff disputes this allegation, contending Samuels admitted that he had knowledge of the prior lawsuit.

In January 2003, Rod Blagojevich was sworn in as Governor of Illinois, and on January 17, 2003, Bamani Obadele was assigned to DCFS as the Governor's liaison and Deputy Director of External Affairs, and during the next few months he had some role, as the Governor's liaison, in selecting candidates for senior positions.  The Plaintiff generally agrees with this assertion.  She claims, however, that the conclusion Mr. Obadele "had some role" in DCFS personnel matters greatly minimizes the role he played.  On April 15, 2003, Samuels was appointed as DCFS Director, and in May

2003, Robin Staggers became DCFS' Deputy Director over Personnel. The Defendant alleges that thereafter, Obadele had no further authority concerning the employees outside the External Affairs Division. The Plaintiff disputes the assertion that Obadele had no authority regarding personnel matters after Staggers was hired.

On May 21, 2003, Staggers' second day in her new position, the Plaintiff met with Staggers for the first time, but that meeting did not go well. According to the Plaintiff, there was "bickering" between the Plaintiff and Joni Stahlman, the Chief of Personnel who was also present at the meeting, and it was a bad meeting. The Defendant alleges that Staggers denies knowing about the Plaintiff's 2000 lawsuit at any time during 2003. The Plaintiff contends this assertion is belied by the testimony of Bryan Samuels and by statements which are attributed to Bamani Obadele.

(2)

During the summer of 2003, changes were being made concerning the Affirmative Action Chief Position. The Defendant alleges one such change is that the new administration issued directions to each of the agencies

4

(including DCFS) through the Department of Central Management Services ("CMS") that deputy director positions should be changed from code positions to double exempt positions.  The Plaintiff disputes the notion that CMS mandated that the affirmative action chief position become "double exempt."  A double exempt position (often termed "4d3" based upon that provision of the Illinois Personnel Code) is one which is exempt from the requirements of the Illinois Personnel Code and from Rutan;[1] it includes positions where the incumbent is appointed by the Governor and serves at will.  The Defendant alleges that neither the Governor, CMS nor it had the authority to change the exemption code.   The Plaintiff disputes this assertion to the extent it suggests that neither the Governor, CMS nor DCFS had a role in creating a double exempt position.  She notes that although the exemption decision must be approved by the Civil Service Commission, the process is initiated at the agency level.

On June 13, 2003, DCFS sent a letter to CMS, asking that the affirmative action chief position be considered for 4d3 exemption.  On June

---

[1] Rutan v. Republican Party of Ill., 497 U.S. 62 (1990).

5

17, CMS forwarded the request to the Illinois Civil Service Commission. One month later the Commission approved the request, and the position description was changed to reflect the 4d3 exemption.

In 2003, DCFS did not have the unilateral authority to fill vacant positions, modify job descriptions, or set compensation. Job descriptions and compensation plans were maintained by CMS and filling vacancies, especially for exempt positions, had to be approved by the Governor's office. When DCFS sought to fill deputy director-level positions, the process included consultation with the Governor's office, selection of a candidate, CMS approval concerning the position and compensation, approval from the Governor's Office of Management and Budget ("OMB") and then approval from the Governor's office. Additionally, sometimes changes to the position descriptions–such as work locations–needed to be made before a candidate could be hired. Finally, if the proposed candidate was currently employed by the State in a position covered by the Illinois Personnel Code, the candidate was required to resign from that position before he or she could be appointed to the vacant position.

The Defendant next alleges that while the Director and/or the Governor's office selected the candidate, staff members in DCFS' Personnel Division shepherded the paperwork through the bureaucratic process. The Plaintiff disputes this assertion to the extent it suggests that Robin Staggers' only role in the hiring process was to shepherd the paperwork through the process.

The Defendant further claims that another significant change that occurred came about somewhat more gradually in 2003; as members of the new administration became more acclimated into their new roles, it became common knowledge that the State was facing a significant budget problem. Accordingly, a guideline was instituted state-wide whereby the amount of pay raises available to individuals being promoted was limited. The Defendant contends, therefore, that some individuals received substantial pay increases when they were promoted in late 2002 (under the prior administration) or early 2003 (before the pay guideline was implemented), but by mid-summer 2003, promotion-based pay increases were generally limited to eight percent. The Plaintiff disputes these statements, asserting

that DCFS can point to no person or written instructions supporting this notion.  More importantly, she alleges Director Samuels stated that this "rule" was in effect the entire time and was not developed later in 2003.

(3)

In December 2002, DCFS' Affirmative Action Chief retired and in January 2003, the Plaintiff was assigned as the acting chief.  The Defendant alleges the Plaintiff then sought out individuals she perceived to have political influence in the hopes of seeking promotion to the position, an assertion which the Plaintiff says is irrelevant.  The Defendant further claims that the Plaintiff also began talking with Obadele about the position and even after Staggers' appointment, despite Obadele's lack of authority over personnel matters, Plaintiff continued to seek out Obadele and rely upon him for office gossip and his perceived political influence.  The Plaintiff reiterates that the parties dispute the extent of Obadele's role in DCFS personnel decisions.  The Plaintiff states that it was "very obvious to anybody in the department that [Obadele] had a lot of power."  Therefore, on March 11, 2003, the Plaintiff told Obadele that she was interested in

becoming the affirmative action chief.  On May 20, 2003, she met with Director Samuels and expressed her interest in promotion to affirmative action chief, telling the Director on two occasions that she wanted a pay increase from about $48,000 to $85,000 per year.

The Defendant alleges that at about that time, Director Samuels and Robin Staggers met to discuss the position, and Staggers recommended considering other applicants outside the agency (pursuant to the 4d3 exemption), in order to ensure that the Director had access to a broader pool of candidates and to maximize the possibility of selecting the best candidate for the job.  The Plaintiff agrees that Staggers told Director Samuels to expand the search; she claims, however, that the justifications offered by Staggers for doing so are a pretext.  Though he considered other candidates, the Director determined the Plaintiff was the best candidate for the position.

The Plaintiff testified that on June 19, 2003, Obadele "officially offered [her] the position on behalf of the director," and told her that "they were giving $10,000 or 5%, whichever was greater."  The Plaintiff then met

with the Director on July 7, 2003, where he formally offered Plaintiff the position of affirmative action chief,[2] and Plaintiff testified that she expressed several concerns about taking the position, including the reporting structure, and that she would "not take the position–I will not take a double exempt." At the meeting, the Plaintiff did not talk with the Director about work location or the timing of the promotion.  On August 4, 2003, the Plaintiff met with the Director and learned that the Governor's Office had not yet signed off on her promotion.  On or about September 16, 2003, the Plaintiff's nomination was approved by the Governor's Office so that the formal appointment process could commence.

On October 7, 2003, CMS approved a change in the job description for the affirmative action chief position, changing the work location from Cook County to Sangamon County, because the Plaintiff lived in Sangamon County and the prior incumbent had been in Chicago.  Thereafter, between October 23, 2003 and November 7, 2003, DCFS obtained all of the

---

[2]The Defendant disputes this allegation and contends that the Plaintiff did not receive the paperwork she knew to be a prerequisite to an "offer" until several months later.

necessary formal approvals for the Plaintiff to be promoted to affirmative action chief.  On November 17, 2003, the documents that the Plaintiff was required to sign in order to be promoted to that position were faxed to her. The Defendant claims even though the Plaintiff  knew that by then that "they weren't giving out $10,000 anymore," she refused to sign the paperwork to accept the position because the position was double exempt and because she considered the eight percent pay increase to be insufficient. The Plaintiff claims this assertion mischaracterizes her testimony; she states, moreover, that individuals received significant amounts of money when they were appointed to various positions at DCFS.

On November 26, 2003, the Director's Chief of Staff, Tom Berkshire, reported, in writing, that Plaintiff "told me that she was not interested in the position as it was now established, and at the pay level she was offered. She stated that the entry SPSA level even though it was an increase in salary was not sufficient related to her years of experience with the agency." Because the Plaintiff declined the position, DCFS thereafter selected Alice Kirby for it.  When Kirby started as affirmative action chief, she assumed

many of the duties the Plaintiff had performed while acting in that capacity.

(4)

The Defendant alleges that the several-month long promotion process was not unique to the Plaintiff; the nominee for DCFS' Chief Counsel position faced similar delays and difficulties.  That candidate also received only an eight percent increase when she was ultimately placed into the chief counsel position, which was also double exempt.  This individual had not filed any Title VII claims against DCFS.  The Plaintiff claims this statement mischaracterizes her testimony, and that she is able to point to others who were treated more favorably.

The Defendant alleges that throughout this period, the Plaintiff had a number of people within the Department with whom she gossiped and shared rumors, including Obadele, Pat Schrodt (the Directors' secretary), Leshonda Rogers (Obadele's secretary), and even "the word around the street."  The Plaintiff disputes this statement to the extent it suggests that the statements made to her by Obadele were gossip and rumors.  Rather, they were statements made by a person with significant authority within

DCFS. The Defendant claims the Plaintiff knew enough to recognize that the rumors and Obadele's statements were suspect; she testified that "it became to the point even from Mr. Obadele that I began to feel that he got some kind of great joy out of the bickering that [Staggers] had towards me, and as much as I liked him, there became a time when I refused to play that game." The Plaintiff asserts the conclusory nature of the Defendant's statement is not supported by the facts.

The Defendant notes the Plaintiff also testified that in July 2003, she heard a rumor that DCFS had hired someone else as affirmative action chief, and that she called Obadele, Peters and the Director about that rumor, and learned it was not true. The Plaintiff agrees with this assertion and further states that the fact that Obadele was able to say the rumor was not true is a reflection on his power with respect to personnel decisions at DCFS.

The Defendant contends the Plaintiff's allegations concerning Staggers are based primarily upon this gossip and rumors–statements she claims were made by Tom Berkshire, Obadele and Schrodt. DCFS notes that Plaintiff

13

claims Berkshire told her that "Robin had this big thing" against her.
Moreover, the Plaintiff claims Schrodt told her that she had overheard a
telephone conversation involving Staggers, where Staggers supposedly said
"that a person like me had no business being in affirmative action," and that
"Robin was doing everything in her power to prevent me from getting the
job." The Defendant further notes that the Plaintiff has alleged Obadele
made several statements about Staggers and how Staggers felt about
Plaintiff getting the position. The Plaintiff disputes the Defendant's
description of Obadele's statements as "gossip" and "rumors." She notes
that her brief makes clear why Obadele's statements are more than gossip.
The Plaintiff never approached Staggers about these rumors or allegations.

(5)

Although the Plaintiff did not know the details of the pay guidelines
in effect in the summer and fall of 2003 for compensation in promotion
cases, and does not know of anyone who was promoted after May 2003 and
received an increase greater than eight percent, Plaintiff claims that others
received greater percentage increases than she, identifying Keith Langston

14

and Arthur Bishop.  Mr. Langston was promoted on June 1, 2003 from Child Protection Advanced Specialist to SPSA, and he received a fifteen percent pay increase.  Mr. Bishop resigned from a covered SPSA position on May 31, 2003, and he accepted an exempt appointment to SPSA effective on June 1, 2003, and he received a 30% pay increase as a special salary adjustment.

B. Plaintiff's undisputed material facts

(1)

The Plaintiff has submitted some additional facts which she claims defeat the Defendant's summary judgment motion.  She notes that Victor Roberson is employed by the Office of Governor Blagojevich in the position of deputy director of intergovernmental affairs.  The Plaintiff further states that throughout the current Governor's tenure, every position of employment with the State of Illinois must go through the Governor's Office of Intergovernmental Affairs.

The Plaintiff alleges that Bamani Obadele offered her the position of Chief of Affirmative Action at DCFS on March 11, 2003.  In response,

15

DCFS states that Plaintiff did not receive the paperwork which she knew to be a prerequisite to an "offer" to accept the position until November 2003.

The Plaintiff claims that on June 24, 2003, Bamani Obadele advised her that Robin Staggers was blocking her promotion to chief of affirmative action. She claims Obadele advised her that Staggers had spoken to Victor Roberson and had blocked her promotion. The Plaintiff alleges, moreover, that Obadele advised her that the reason for this was because she had previously filed a charge of discrimination against DCFS. The Defendant contends this allegation is immaterial and disputed. It is immaterial because there is no evidence that Staggers had the authority to dictate whether the Plaintiff would be offered the position or concerning the terms and conditions of such an offer. Instead, Staggers' role was limited to serving as the deputy director in charge of the department that would be tasked with processing the paperwork for such a promotion. Additionally, the Plaintiff was eventually offered the position and the statement alleged is based solely upon inadmissible hearsay. Finally, the allegation is disputed because Roberson and Staggers both denied, under oath, any such conversations.

On July 7, 2003, Director Samuels met with the Plaintiff and told her he was offering her the chief of affirmative action position.

The Plaintiff alleges that during the meeting on July 7, 2003, Director Samuels advised her that the position would not be a double exempt position. The Defendant claims this allegation is immaterial because there is no evidence that the Director had the unilateral authority to dictate whether the position would be double exempt. Moreover, DCFS disputes the allegation on the basis that the Civil Service Commission was then considering its request that the position be classified as double exempt. The Plaintiff next alleges that prior to July 7, 2003, Obadele had advised her that Robin Staggers was attempting to get the chief of affirmative action position changed to a double exempt position. The Defendant disputes this allegation, contending that the decision to seek double exemption came from outside DCFS and Staggers' role was limited to serving as the deputy director in charge of the department that would be tasked with initiating the paperwork for such an action. DCFS also claims that the statement is immaterial because it is based solely on inadmissible hearsay.

The Plaintiff next alleges that on August 20, 2003, a new organizational chart for DCFS was released and it indicated that she was no longer classified as chief of affirmative action. The Defendant notes that the Plaintiff had not yet received the paperwork that would be required for such a promotion, let alone signed off on it. The Plaintiff further contends that on September 8, 2003, Obadele advised her that Robin Staggers had gone to Victor Roberson and was blocking her appointment to the position of chief of affirmative action. The Defendant claims this allegation is immaterial because there is no evidence that Staggers had the authority to dictate whether Plaintiff would be offered the position or concerning the terms and conditions of such an offer. Moreover, the statement is based solely upon inadmissible hearsay. DCFS also contends that the allegation is disputed because Roberson and Staggers both denied any such conversation.

(2)

On September 23, 2003, the Plaintiff filed a charge of retaliation against DCFS with the Illinois Department of Human Rights. The Plaintiff

alleges that in late October 2003, she spoke with Director Samuels at a community outreach event in Chicago. During that event, Samuels told her he would not talk to her about any work-related issues because she had filed a complaint against DCFS. The Defendant contends this allegation is immaterial because the paperwork for her promotion was still being processed. DCFS emphasizes it is disputed, moreover, because Samuels refused to discuss the Plaintiff's complaint at this meeting and did not refuse to talk with her about work-related issues.

The Plaintiff further alleges that on October 29, 2003, she sent a letter to Director Samuels which references a conversation she claims to have had with Samuels on October 27, in which he told her he would not speak to her "as long as [she] had a lawsuit against the Department." The Plaintiff also asked Samuels to inform her if she misunderstood any of the conversation. The Defendant contends this allegation is immaterial on the basis that it constitutes hearsay, and because there is no basis for any claim that the Director had any obligation to respond to this letter in any way. Moreover once the Plaintiff filed a charge of discrimination, it would have been highly

improper for the Director to have interfered with the administrative process for resolving the charge.

(3)

On November 17, 2003, the Plaintiff was offered, in writing, the position of chief of affirmative action. According to the offer, she would be paid $4401 per month [$52,812 annually] and the position would be double exempt. The Plaintiff states that in response to the written offer, her attorney on November 19, 2003 wrote a letter to Director Samuels outlining why the salary offered was not sufficient and fell far short of the salary of comparable employees at DCFS. The Defendant contends this allegation is immaterial because it includes hearsay evidence and because it occurred after any decisions were made which might arguably be relevant to this case. The Director did not respond to the letter; DCFS claims he had no obligation to respond and it would have been highly inappropriate for him to do so after the Plaintiff had filed a charge of discrimination.

On December 30, 2003, Director Samuels sent a letter to the Plaintiff advising her that because she had complained about the salary level and the

double exempt status of the chief of affirmative action position, her name was no longer being considered for the position. In response, DCFS claims the Plaintiff was not being considered immediately prior to that date–since she had first rejected the position on November 23, 2003. On December 23, 2003, Director Samuels submitted the name of Alice Kirby for the position of chief of the DCFS affirmative action office.

The Plaintiff alleges Bamani Obadele advised her that the reason the chief of affirmative action position was being changed to a double exempt position was so they could offer her the job and fire her two months later. The Defendant claims this allegation is immaterial because it is double hearsay, lacks foundation and is obviously speculative. The Plaintiff next asserts that all personnel decisions at DCFS go through Victor Roberson. The Defendant states this allegation is immaterial and disputed. It maintains Roberson testified that during his tenure, changes in positions (not "all personnel decisions") must be approved by the Intergovernmental Affairs Office, of which he was a deputy director.

The Plaintiff further contends that the classification of a State of

21

Illinois job as a 4d3 position means the same thing as a job being labeled "double exempt." Both mean that an employee is purely an employee at will, can be fired at any time for any reason, and has no rights under the personnel code of the State of Illinois. The Defendant claims this allegation is immaterial. The Civil Service Commission is the entity responsible for resolving the matter; DCFS' role was purely ministerial. Next, the Plaintiff asserts the phrase "term appointment" is different than a position that is "double exempt." When a person is working in a term appointment, he or she is given a position for a period of four years (oftentimes renewed). During those four years, the employee has all the protections of the personnel code and cannot be fired without cause. DCFS proffers the same objection noted above.

(4)

The Plaintiff alleges that Victor Roberson commenced his employment with the State of Illinois in the Office of Governor Blagojevich on May 6, 2003. The Defendant claims this allegation is immaterial because her promotion was approved by the Intergovernmental Affairs Office and that

22

Roberson did not have any conversation with Staggers about the Plaintiff. The Plaintiff next contends that Robin Staggers is a good friend of Roberson's and the two worked together on the Governor's campaign. The Defendant states that the allegation is immaterial for the same reason.

The Plaintiff next alleges that Bamani Obadele was responsible for hiring Staggers, an allegation which DCFS claims is immaterial because Staggers' role was limited to serving as deputy director responsible for the division tasked with processing paperwork for Plaintiff's promotion, and Obadele's role in hiring was limited after Staggers was hired. The Plaintiff states that Roberson and Obadele are close friends who often spoke about personnel issues. DCFS asserts this is irrelevant because her promotion was approved by the Intergovernmental Affairs Office. Additionally, the Defendant claims Plaintiff's assertion that, during 2003, Roberson would talk to Staggers several times a day about personnel issues is immaterial because Staggers' role was limited as previously noted.

The Plaintiff further contends that, according to Roberson, Obadele had a significant amount of influence while he was employed at DCFS.

23

Obadele is also a friend of Governor Blagojevich.  The Defendant claims

these allegations are immaterial because there is no suggestion that Obadele

held any animosity toward the Plaintiff or exercised improper influence

concerning her.  Moreover, having "influence" does not equate to having

authority or responsibility concerning any aspects of Plaintiff's employment

after May 2003, or any authorized role in her potential promotion after

May 2003.

(5)

The Plaintiff next alleges that at any time during 2003, an agency

could request that the salary of an individual be increased by more than

eight percent.  This request had to originate from the agency.  The

Defendant asserts that Plaintiff's allegation is immaterial, on the basis that

the issue is not whether she was entitled to some exceptional treatment, but

whether she was treated consistently with other employees who were

similarly situated with her.  In May 2003, Robin Staggers became the

Deputy Director of Human Resources at DCFS.  The Plaintiff states that in

November 2005, Staggers was involuntarily transferred.  The Defendant

24

claims that allegation is immaterial because the circumstances of Staggers' employment are not at issue in this action.

The Plaintiff next asserts Staggers acknowledged that she spoke with Obadele on several occasions about the Plaintiff and the chief of affirmative action position. The Defendant disputes this allegation on the basis that Staggers testified she could recall only one such conversation and that she did not know whether there were others. DCFS further maintains that the allegation is immaterial because Staggers' role was limited to serving as the deputy director responsible for the division tasked with processing paperwork for the Plaintiff's promotion.

The Plaintiff alleges that in assessing what salary someone would be paid, the starting point was to look at the salary made by the previous occupant of the position. The Defendant claims that the allegation is immaterial. It notes that although the starting point was the predecessor's salary, there is no dispute that by summer of 2003, the ending point was that in promotion cases, any increase was limited to eight percent of the individual's former salary. The Plaintiff contends that no request was ever

made by DCFS to increase the amount of money to be offered to her. The Defendant reiterates that the issue is not whether the Plaintiff was entitled to exceptional treatment.

(6)

The Plaintiff alleges that Leshonda Rogers has been employed by DCFS since 2000. In 2003, Rogers reported directly to Bamani Obadele. The Plaintiff contends that in May 2003, Obadele advised Rogers that Plaintiff would get the chief of affirmative action position. Obadele advised Rogers that Robin Staggers was not going to allow the Plaintiff's promotion to go through. He told Rogers they would give the Plaintiff the position but that Staggers had made it "double exempt" so that they could get rid of her within a couple of months. The Plaintiff further asserts that Obadele advised Rogers that the Plaintiff would not be offered the position because she had filed a lawsuit against DCFS. The Defendant maintains that all of these allegations are immaterial because they are based on inadmissible double hearsay.

In April 2003, Bryan Samuels was appointed as Director of DCFS.

26

Director Samuels deals with Victor Roberson on personnel matters.  The
Plaintiff alleges that even though Robin Staggers was hired after Samuels
became Director, he had no role in the decision to hire her.  The Defendant
claims that the circumstances of Staggers' accepting employment with
DCFS are not relevant to this action.  The Plaintiff asserts that during
Samuels' tenure, Staggers and Bamani Obadele were the only individuals
who were hired into high-ranking positions at DCFS with Samuels playing
no role in the selection.  The Defendant proffers the same objection as to
the previous allegation.

The Plaintiff next alleges that according to Director Samuels, Robin
Staggers communicated with the Governor's office frequently about hiring
decisions.  The Defendant disputes this allegation, noting that while
Samuels testified Staggers regularly talked to people in the Governor's office
about "personnel issues," she did not say that she communicated with the
Governor's office frequently about "hiring decisions."  The Plaintiff next
contends that in deciding who to place into the chief of affirmative action
position, Samuels spoke with Staggers, Obadele and Liz Yore.    The

27

Defendant asserts this allegation is immaterial and disputed.  DCFS claims Samuels did not speak to those individuals about who to place in the position.  Rather, he testified that he would have spoken to Staggers about the process for filling the position, and that he may have also had discussions with Liz Yore, Bamani Obadele and Tom Berkshire regarding the process.  The Defendant maintains it is immaterial because Staggers, the only person that the Plaintiff claims was hostile to her promotion, had no authority concerning whether she would receive the promotion.

The Plaintiff further alleges that Staggers came to Samuels and requested that the chief of affirmative action position be reclassified from a "term appointment" to a "double exempt" appointment.  The Defendant contends this allegation is immaterial and disputed.  DCFS disputes the allegation by noting that Samuels testified only that Staggers was "interested" in changing the position's classification because it would allow greater flexibility in finding someone to fill the position, in part, since it would provide greater latitude in the salary range and thereby "give us a wider range of folks that we might be able to attract to the position."  The

28

Defendant claims this assertion is immaterial because Staggers had no authority regarding whether the Plaintiff should receive the promotion.

(7)

Director Samuels indicated that his initial impression of the Plaintiff was quite favorable.  Specifically, he said she was "very focused, very serious and very committed to her work."  The Plaintiff alleges that in 2003, Samuels had a discussion with Robin Staggers about the fact that Plaintiff had previously sued DCFS.  The Defendant contends that the allegation is immaterial and is disputed.  DCFS claims it is disputed because Samuels testified that at some point he learned Plaintiff had filed a previous lawsuit and that while he could not say he had in fact discussed it with Staggers, he said it would have been a "reasonable assumption" that "at some point in time" he would have done so.  The Defendant again claims it is immaterial because Staggers had no authority regarding the Plaintiff's promotion.

The Plaintiff next alleges that according to Director Samuels, throughout his tenure at DCFS there was a rule that prohibited a salary increase of more than ten percent.  The Defendant disputes this allegation,

29

noting that in the referenced deposition page, Samuels testified that initially "no increase could exceed 10 percent of the person's existing salary. That was set by the Governor's office. . . . And since then that number has been reduced from 10 percent down to 8 percent. And that rule still exists." The Defendant also claims the allegation is immaterial in that the Plaintiff has not claimed retaliation based upon a difference between eight percent and ten percent of the prior salary.

The Plaintiff next asserts that the chief of affirmative action was not a deputy director position. The Defendant disputes this allegation, contending that Director Samuels testified that the position was not titled "deputy director" because "the affirmative action position did not in and of itself have a division." Nevertheless, on the organizational chart the position was comparable to deputy director positions.

The Plaintiff alleges that in late May or early June 2003, Director Samuels met with Robin Staggers about the position of chief of affirmative action. Staggers recommended that he consider applicants other than the Plaintiff. The Plaintiff asserts that Al Lambert, who retired from DCFS in

December 2002, was paid $89,616 when he held the position of chief of affirmative action.  The Defendant claims that allegation is immaterial because the key factor for the salary level for the Plaintiff's planned promotion was an eight percent increase from her prior salary.

The Plaintiff next alleges that Alice Kirby was selected as the chief of affirmative action on or about December 16, 2003.  She was offered a salary of $78,900.  The Defendant maintains these allegations are immaterial because the Plaintiff had by then rejected the position and because Kirby's salary was based upon her prior salary.  The Plaintiff contends that the chief of affirmative action position had a payroll title of SPSA.  In November 2003, the average SPSA was paid more than $84,000 per year.  Moreover, the lowest paid SPSA at DCFS was paid $63,588.  The Defendant claims these allegations are not relevant to the salary level for her planned promotion.  There is no evidence that the amounts paid to people in other positions was a factor in promotional compensation decisions.

The Defendant contends that the Plaintiff has proffered no admissible evidence of retaliation sufficient to prevail under the direct method

approach.  Moreover, she is unable to prevail pursuant to the indirect method because she cannot make out a prima facie case of retaliation.  For these reasons, the Defendant alleges it is entitled to summary judgment.

## II. ANALYSIS

### A. Summary Judgment standard

The entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A "material fact" is a fact which may affect the outcome of the litigation, given the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  There is a "genuine issue" of material fact when a reasonable juror could find that the evidence supports a verdict for the non-moving party.  Id.  "Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  <u>Celotex Corp.</u>, 477 U.S. at 322.  If a defendant can show the absence of some fact that the plaintiff must prove at trial, then the plaintiff must produce evidence, and not merely restate his allegations, to show that a genuine issue exists.  <u>Sartor v. Spherion Corp.</u>, 388 F.3d 275, 278 (7th Cir. 2004).

<u>B. Title VII retaliation</u>

The retaliation provision of Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  There are multiple ways for a plaintiff to show that she was retaliated against.

(1)

The Defendant first contends that the Plaintiff is unable to prevail on a direct method/direct evidence theory because she cannot present evidence that constitutes an admission by the decision-maker that it made a decision adverse to the Plaintiff because she had filed a lawsuit against it in 2000.

33

Next, the Defendant asserts that Plaintiff also cannot prevail on a direct method/circumstantial evidence theory because the circumstantial evidence shows that the Plaintiff was not subjected to any form of retaliation due to her 2000 lawsuit.

The Defendant further claims that the Plaintiff is unable to prevail on an indirect method theory because she cannot satisfy the fourth element of her prima facie case–she cannot show that she was treated less favorably than similarly situated employees who had not engaged in protected activity. Moreover, the Defendant alleges that it has presented legitimate, non-discriminatory reasons, in that the factors the Plaintiff complains of–the double exempt classification and the percentage pay increase–were not within its control. The Defendant states that Plaintiff is unable to show that this explanation is pretextual.

(2)

In her response brief, the Plaintiff alleges that she did sustain an "adverse employment action" as that term is understood in the context of Title VII retaliation law. The Plaintiff asserts that she has presented direct

34

evidence of discrimination–specifically the Defendant's admission of wrongdoing when Robin Staggers and Bamani Obadele acknowledge that Plaintiff was not offered the job because of her claims against DCFS. The Plaintiff further claims that Obadele's statements to her and to Leshonda Rogers are admissible. The Plaintiff next contends that the statements attributed to Robin Staggers constitute the admission of a decision-maker.

The Plaintiff further asserts that she has presented sufficient circumstantial direct evidence of discrimination. Specifically, she contends that a reasonable conclusion the Defendant intended to retaliate against her may result when the statements attributed to Staggers are considered along with the conduct of Director Samuels.

The Plaintiff next contends that she is able to allege a prima facie case of discrimination. She claims she is able to establish that she was treated less favorably than similarly situated employees in that other employees were offered a greater salary increase than her. Moreover Alice Kirby, who was ultimately awarded the position of chief of affirmative action, was given a salary of $78,900 upon her acceptance–$26,900 more than the Plaintiff

was offered.  Additionally, the Plaintiff notes that she was the only person whose position was changed to "double exempt," and all other SPSA positions were paid significantly more than she was offered.

The Plaintiff next contends that she has created a genuine issue of material fact regarding whether the Defendant's justifications are pretextual. She asserts the Defendant cannot allege that it did not make the position double exempt and that it did not set the percentage pay increase. Moreover, the Plaintiff claims Victor Roberson indicated agencies such as DCFS could request a specific salary.

In its reply brief, the Defendant alleges there is no admissible evidence of retaliation which would be sufficient for the Plaintiff to prevail under the direct method approach.  Citing Williams v. Pharmacia, Inc., 137 F.3d 944, 950 (7th Cir. 1998), the Defendant notes that the statements must be "within the scope of the declarants' agency or employment," and the statements made by Robin Staggers are not.  Next, the Defendant reiterates that the Plaintiff cannot prevail under the indirect method because she cannot maintain a prima facie case of retaliation, in that she is unable to

36

show she was treated less favorably than any other similarly situated employees who did not engage in statutorily protected activity.

(3)

"To establish retaliation under the direct method of proof, a plaintiff must offer evidence that he engaged in a statutorily protected activity, that the defendants subjected him to an adverse employment action and that a causal connection exists between the two events." Treadwell v. Office of Illinois Secretary of State, 455 F.3d 778, 781 (7th Cir. 2006). The direct method does not always require direct evidence. Id. "[C]ircumstantial evidence that is relevant and probative on any of the elements of a direct case of retaliation may be admitted and, if proven to the satisfaction of the trier of fact, support a case of retaliation." Id. (citing Sylvester v. SOS Children's Villages of Illinois, 453 F.3d 900, 902-03 (7th Cir. 2006)).

In order to allege a prima facie case of retaliation under the indirect method, a plaintiff must show that "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse

employment action even though (4) he was performing his job in a satisfactory manner." Treadwell, 455 F.3d at 782 (quoting Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 643 (7th Cir. 2002)).

The Plaintiff alleges that the "adverse employment action" requirement in the context of a retaliation claim is not the same as in other types of Title VII cases.  In Robinson v. Shell Oil Co., 519 U.S. 337, 339-40 (1997), for example, the Supreme Court concluded that the protections against retaliation under Title VII extended to a former employee as well as to current employees.  The allegation in Robinson, 519 U.S. at 339, was that the employer retaliated against the former employee who had filed an EEOC charge by providing a negative employment reference.  Because the plaintiff in Robinson was not an employee at the time of the alleged retaliatory action, the Plaintiff contends that the Supreme Court has recognized that Title VII retaliation claims are treated differently than other Title VII claims.

The Plaintiff states that the Seventh Circuit has recognized the principle in Robinson and has noted the distinction between a retaliation

claim brought under Title VII and other claims brought under Title VII. See McDonnell v. Cisneros, 84 F.3d 256, 259 (7th Cir. 1996) ("The provision regarding retaliation may intentionally be broader [than provisions requiring an adverse employment action], since it is obvious that effective retaliation against employment discrimination need not take the form of a job action."); see also Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 745 (7th Cir. 2002) ("We do not mean to suggest . . . that retaliation, to be actionable under Title VII (or other statutes), has to involve an adverse employment action.  It does not."); see also Aviles v. Cornell Forge Co., 183 F.3d 598, 605 (7th Cir. 1999).

(4)

The Plaintiff contends that she did experience an adverse employment action as that is understood in the retaliation context.  She relies primarily on several examples.  The Plaintiff notes that her promotion was on again/off again for almost eight months.  Moreover, she was offered a position that would have given her a very minimal raise that was significantly below what the position should have paid.  Finally, the Plaintiff

39

was offered a double exempt position that would have provided her with

absolutely no job protection.  She claims she was told that she would be

fired within a couple of months of accepting the job.

The Court concludes that the Plaintiff is unable to meet her burden

pursuant to the indirect method of retaliation.  The Plaintiff cannot show

that she was treated less favorably than any other similarly situated

employees who did not engage in statutorily protected activity.   The

Defendant notes that in its statement of alleged undisputed material facts,

it alleges the following:

> This several-month-long promotion process was not unique to
> Plaintiff; according to Plaintiff, the nominee for DCFS' Chief
> Counsel position faced similar delays and difficulties, this
> candidate also received only an 8% increase when she was
> ultimately placed into the Chief Counsel position, which was
> also a double exempt position.  This individual has not filed any
> Title VII claims against DCFS.
> (PL. Dep. 89-91; Griffin Aff. ¶ 10).

The Plaintiff responds to the allegation by simply stating, "This statement

mischaracterizes Gardner's testimony.  For the reasons outlined throughout

this brief, Gardner adequately points to others who were treated more

favorably."   By failing to dispute the Defendant's alleged statement of

40

undisputed fact, the Plaintiff admits that another job candidate at DCFS experienced delays, was offered only an eight percent raise, and was placed into a double exempt position.

The Plaintiff attempts to dispute the Defendant's allegation by comparing herself to other DCFS employees. However, the Plaintiff fails to specify how she was similarly situated to these other employees. Because the Plaintiff is unable to meet this element, therefore, she is unable to allege a prima facie case of retaliation under the indirect method.

(5)

As for the direct method of retaliation, the parties argue about the admissibility of the evidence upon which the Plaintiff primarily relies. After carefully reviewing the record and the arguments of the parties, when the evidence is viewed in a light most favorable to the Plaintiff, the Court concludes there is a genuine issue of material fact as to whether she was retaliated against. The Plaintiff notes that she was told the following by Bamani Obadele:

> He told me that Joni Stahlman had provided information to Robin on my lawsuit. My previous case against DCFS, and that

41

> Robin said that anybody who had–I don't remember the
> terminology–whatever, to file charges against the department
> didn't have a right to be chief of affirmative action, to run that
> office.

The Plaintiff alleges, moreover, that Leshonda Rogers also testified that

Obadele said that Plaintiff would not get the job because she had previously

filed a lawsuit against DCFS.  Of course, the Plaintiff was eventually offered

the job.

The Plaintiff contends that these statements attributed to Staggers

and Obadele do not constitute inadmissible hearsay.  The Plaintiff asserts

that Obadele's alleged statements are admissible, pursuant to Federal Rule

of Evidence 801(d)(2)(D), on the basis that they are the statements of the

Defendant's agent or servant made within the scope of his agency or

employment.  The Plaintiff alleges that there is at least a question regarding

whether the statements were made within the scope of Obadele's agency.

The Plaintiff further claims there is a dispute regarding whether he had

authority over personnel issues.  Moreover, Obadele was a major player

when it came to hiring decisions and other important decisions at DCFS,

which the Plaintiff suggests resulted from his close personal friendship with

Governor Blagojevich.  According to the Plaintiff, DCFS Director Bryan Samuels testified that when he was looking to fill the affirmative action position, he likely spoke with Robin Staggers, Liz Yore (DCFS' legal counsel), Chief of Staff Tom Berkshire, and Obadele.

In response, the Defendant alleges Samuels did not testify that he spoke with those individuals about "deciding who to place into the chief of affirmative action position," as the Plaintiff suggests.  Rather, he would have talked to Staggers about the process for filling the position, and he may have had similar discussions with the other individuals.  The Defendant emphasizes that Staggers–the only person who is alleged to be hostile to the Plaintiff's promotion–had no authority concerning whether she would receive it.

The Plaintiff further notes Obadele has not denied that he made these statements or that Robin Staggers made them to him.  Instead, Obadele chose to invoke his rights under the Fifth Amendment.  After testifying at his deposition that he had informed Staggers he thought the Plaintiff would make a good candidate for the position, Obadele invoked his rights under

the Fifth Amendment when questioned further regarding conversations about the Plaintiff.[3]  The Plaintiff claims that Obadele's refusal to testify should weigh in her favor.  In response, the Defendant alleges that no such inference should be drawn.  It is just as likely that if Obadele had testified, his statements would have been helpful to the Defendant.

The Plaintiff also contends that Robin Staggers exercised great influence over all hiring decisions at DCFS.  Moreover Staggers stated, "I was not certain that [the Plaintiff] was the best available candidate for the position."  She recommended to Director Samuels that he consider other individuals "in order to ensure [the] access to a broader pool of candidates and to maximize the possibility of selecting the best candidate for the job." The Defendant asserts that Staggers exercised no such influence.  Her role was to process the paperwork.

When viewing the evidence in the light most favorable to the Plaintiff, the Court concludes there is just enough evidence to create a factual dispute

---

[3]The Plaintiff states that Bamani Obadele resigned from DCFS in August 2005.  She further notes that media outlets have reported that Obadele's resignation came after the inspector general accused him of diverting at least $62,000 in public funds to a private bank account.

on the Plaintiff's retaliation claim pursuant to the direct method, based on the "double exempt" status of the position that she sought and its alleged connection to her previous statutorily protected activity.   The Court recognizes that there may be problems with the admissibility of some of the testimony on which the Plaintiff relies.   Because the testimony may be able to be reduced to admissible evidence, however, the Court declines to grant summary judgment to the Defendant.

Ergo, the Defendant's motion for summary judgment [d/e 17] is DENIED.

ENTER: January 11, 2007

FOR THE COURT:

s/Richard Mills
United States District Judge

45